UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| SCOTT BAKER,<br><br>      Plaintiff,<br>v.<br><br>PAUL MONTRONE, PAUL MEISTER, PERSPECTA TRUST, LLC, BAYBERRY FINANCIAL SERVICES CORP., and LIBERTY LANE SERVICE COMPANY LLC.<br><br>      Defendants. | Civil Action No. 1:18-CV-913 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Scott Baker, by and through his undersigned counsel, hereby files his complaint against Defendants Paul Montrone, Paul Meister, Perspecta Trust, LLC, Bayberry Financial Services, Corp., and Liberty Lane Service Company LLC for violation of the Americans with Disabilities Act as amended ("ADA") 42 U.S.C. § 12101 *et. seq.* and the New Hampshire Law Against Discrimination RSA 354-A, and alleges as follows:

**PARTIES**

1. Plaintiff Scott Baker ("Plaintiff" or "Baker") is an individual residing in North Hampton, New Hampshire.

2. Defendant Paul Montrone ("Montrone") is an individual residing and working in the State of New Hampshire.

3. Defendant Paul Meister ("Meister") is an individual residing and working the State of New Hampshire.

4. Defendant Perspecta Trust LLC ("Perspecta Trust") is a New Hampshire limited liability company with its principal place of business located at 1 Liberty Lane, Hampton, New Hampshire.

5. Defendant Bayberry Financial Services Corp. ("Bayberry") is a corporation formed under the laws of the State of Delaware with a principal place of business located at 1 Liberty Lane, Hampton, New Hampshire.

6. Defendant Liberty Lane Service Company LLC ("Liberty Lane" and collectively with Perspecta Trust and Bayberry, "Perspecta") is a limited liability company organized under the laws of the State of Delaware with a principal place of business located at 1 Liberty Lane East, Ste 100, Hampton, New Hampshire.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Baker's claims under the ADA, 42 U.S.C. § 12101 *et. seq.* pursuant to 28 U.S.C. § 1331.

8. This Court has supplemental jurisdiction over Baker's claims under the New Hampshire Law Against Discrimination, RSA 354-A, pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

10. In 2007, Montrone and Meister formed Perspecta Trust, a state-regulated, New Hampshire-based, non-depository trust company based in Hampton, New Hampshire (its sole location). Perspecta Trust provides various trustee services, as well as investment management, estate planning, wealth transfer planning and other family services.

4828-4145-2404.7

11. In 2009, Baker, while living in Connecticut, was contacted by an independent recruiter acting on behalf of Perspecta, to explore a leadership role that Perspecta had been looking to fill for some time.

12. After a series of negotiations, Baker accepted Perspecta's offer to join Perspecta as a Principal, and he moved from Connecticut in time for his first day of employment on May 11, 2009.

13. From May 2009 through 2013, Baker successfully served as a Principal of Perspecta.

14. In May 2013, Perspecta's Board of Directors appointed Baker President of Perspecta, a roll previously held by Montrone. Upon information and belief, the Board of Directors made this appointment based on Montrone's recommendation.

15. As both Principal and President of Perspecta, Baker ran the day-to-day operations of the company, as well as implemented the company's strategic plan. His primary duties consisted of client solicitation, client management, marketing, Board of Director and owner interaction, and the recruiting, hiring and management of employees. Baker also had principal responsibility for the company's financial performance.

16. Perspecta is an "employer" within the meaning of 42 U.S.C. § 12111(5).

17. At all relevant times, Liberty Lane and/or Bayberry operated as Baker's co-employer along with Perspecta Trust. All three entities shared common management and control over Baker's positions as Principal and then as President. Montrone and Meister (and associated trusts and entities) are common owners of Perspecta Trust and Liberty Lane. Montrone (and associated trusts and entities) own and control Bayberry.

18.     Throughout the course of his employment, Baker reported to Montrone and Meister – Perspecta's co-founders and majority owners. Montrone served as Perspecta's CEO, President (until succeeded by Baker) and Chairman of the Board. Meister served as Perspecta's Vice-Chairman of the Board.

**I.      Perspecta Fostered A Work Environment That Was Hostile To Those With Disabilities**

19.     Montrone and Meister strove to ensure that Perspecta's workforce was "robust and healthy." During Baker's tenure at Perspecta, he observed that if an employee or prospective employee did not fit that model, there would be no place for them within the building (Perspecta and related entities). Indeed, on or about April 14, 2009, prior to commencing employment with Perspecta, Baker himself was subjected to a 3-hour psychological assessment for purposes of pre-employment evaluation.

20.     In July 2015, after interviewing a prospective candidate, Meister communicated his concerns about the mental health of the applicant in response to Baker's request for post-interview feedback. Meister commented on the applicant's shaky hands and his assumption that it was caused by depression medication. Meister suggested staying away from the candidate for this reason alone.

21.     In or around the spring of 2017, Montrone hired an assistant who needed to leave Perspecta after less than a week on the job due to a health condition. After his assistant left for health reasons, Montrone mandated a policy where employees should be young and healthy, if they were to work for him.

22.     For a period of time, Perspecta required all prospective employees who were offered a job to undergo pre-employment medical exams, regardless of whether their job

4

required physical activity.  The results of these physicals were then shared with Montrone for assessment, before being redacted, and placed into the employee's file.

## II. When Baker and His Family Members Suffered From Disabilities, Perspecta Treated Him Differently

23. Beginning in 2015, Baker and his family members began experiencing physical and mental health challenges.

24. In September, 2015, Baker's wife was diagnosed with cancer, which required extensive treatment.  In October 2015, she had her first of three surgeries to attempt to remove the cancer, but it was unsuccessful.  Then in November, 2015, Baker's wife began to experience deep depression, which required treatment and medication.  She continued receiving treatment for cancer and depression throughout 2016.  Not only was cancer a catalyst for the depression, but given the nature of the cancer, it was unlikely that she would be able to have children going forward, something that Baker and his wife had been planning.  Furthermore, at the time Baker's wife was diagnosed with cancer, she had been working to start a new consulting business.  As a result of her disabilities she was unable to work and move forward with her plans.

25.  In late 2015, Baker's daughter also began to suffer from mental health issues, which endured throughout 2016 and 2017.  Among many things, this was brought on by cyber-bulling, which she experienced at school.  Her mental health interfered with her daily life to the extent that she was asked to leave school in 2016 to try and improve her condition.  Baker's daughter required extensive treatment and medication to try and treat her disability.

26. In or around December 2015, as a result of his struggle to cope with his wife and daughter's disabilities, Baker himself began experiencing significant anxiety and depression. The depression and anxiety caused Baker to have difficulty sleeping, eating, concentrating, and interfacing with others, despite his continuous efforts to treat and improve his condition.  Though

Baker sought medical treatment and tried numerous medications, his symptoms persisted throughout 2016 and well into 2017.

27. In January 2016, Montrone informed Baker that his equity plan in Perspecta was being terminated, under the auspices of a new and much better plan coming in the future.

28. In the weeks following this notice from Montrone, Baker attended a meeting with Montrone wherein Baker wanted to discuss the termination of his equity plan, and the corresponding buy-out price of such. During this meeting, Baker became emotional and visibly upset, and he explained to Montrone the trauma he was undergoing in his personal life. He spoke openly and candidly with Montrone about his wife and daughter's persistent physical and mental disabilities. Baker also stated that he was not in a position to negotiate with Montrone about these terms, as he wished to focus on his family's health, and that he trusted Montrone to do the right thing and live up to the commitments and representations he made about a replacement equity plan.

29. In or around January 2016, Perspecta's Chief Financial Officer was inappropriately informed that Baker was taking an expensive prescription medication and that Baker had tried alternative medications that were not successful in treating his conditions. Correspondence regarding Baker's request to Perspecta's self-insured policy for reimbursement for his medication was placed in Baker's personnel file at Perspecta.

30. As Baker's health and the health of his family members deteriorated, so too did the treatment he received at work.

31. Meister began disassociating himself from Baker, excluding Baker from client meetings and communications, conducting business behind Baker's back and without his

approval, and ultimately ceasing all direct communications with Baker despite Baker's repeated attempts to engage him.

32. Though Baker was facing many challenges and a debilitating condition in his personal life, he continued to successfully manage the business, achieving increasingly better results for Perspecta.

33. At no time following the onset of Mr. Baker's condition, or that of his family members, did Montrone, Meister or the Perspecta Board provide any negative feedback to Baker, nor did they make note of any unsatisfactory performance by Baker personally, or the company broadly.

34. Under Baker's leadership, Perspecta's business grew significantly. Revenues increased each year, achieving record revenues in 2017, its client base expanded broadly and Perspecta was named as one of the Top 5 Trust Companies in the World by the Society for Trust and Estate Practitioners in 2015, 2016 and 2017. Perspecta Trust was also named Trust Company of the Year in the United States in 2015 by Private Wealth Report magazine.

35. Baker was able to achieve this success despite his personal hardships and despite certain business practices of Meister and Montrone to which Baker objected.

36. Perspecta touted the accomplishments achieved with Baker as President in various press releases and took great pride in what it had achieved under Baker's leadership.

37. On or about March 14, 2017, Perspecta's Board of Directors approved Baker's continuation as Perspecta's President, with no discussion or debate on whether to do so was appropriate.

38. Despite this success, Meister's treatment of Baker continued to deteriorate.

39.     On or about May 1, 2017, Baker met with Montrone to express his concerns regarding the manner in which Meister was treating him in the workplace. Baker voiced his concerns to Montrone because not only was Meister's treatment discriminatory, but Baker was also concerned about the impact Meister's conduct was having on the business and its clients.

### III.     Montrone, Meister And Perspecta Retaliate Against Baker

40.     On or about May 15, 2017, two weeks after Baker approached Montrone with concerns regarding Meister's discriminatory treatment and its potential impact on the business, Montrone met with Baker and informed him that his future with Perspecta was in jeopardy. When Baker asked Montrone for an explanation as to why his future with Perspecta was uncertain, Montrone simply told Baker that he and Meister determined that Baker "wasn't the right guy."

41.     Perspecta never told Baker it had concerns regarding his performance, nor did Montrone indicate Baker's performance was suffering during their May 15, 2017 meeting. Upon information and belief, the meeting minutes and notes from Perspecta's Board of Directors meetings do not reflect that the Board expressed or experienced any dissatisfaction with Baker's performance. Indeed, just two months prior, the Board of Directors voted to reappoint Baker as the President of Perspecta, and one month prior, on or about April 13, 2017, Perspecta awarded Baker a discretionary bonus.

42.     Following the May 15, 2017 meeting, Baker continued to experience disparate treatment and a hostile work environment, which included but was not limited to Montrone and Meister treating him differently, and Meister refusing to work with him.

43.     Following the May 15, 2017 meeting, Perspecta placed continuous pressure on Baker to resign. In the course of negotiations between Baker and Perspecta, Perspecta's counsel

repeatedly referenced Baker's "resignation," though Baker continued to impress upon Perspecta that he did not, or plan to, resign.

44. On December 1, 2017, Perspecta's counsel informed Baker that his last day of employment would be December 8, 2017.

45. Despite this, Perspecta continued to pressure Baker to resign – even going so far as to list Baker's "resignation" as an agenda item on a draft document for the December 8, 2017 Board of Directors meeting.

46. Upon seeing this action item on the agenda, Baker sent a letter to Montrone, as Chairman of the Board, copying the other Board members, informing them that he had not resigned, had no intention of resigning, and wished to continue to lead Perspecta.

47. On December 8, 2017, Baker attended the beginning of the Board of Directors meeting. After he advised the attendees that he was not resigning, Perspecta told Baker that his employment was "ending." Perspecta neither indicated that it was terminating Baker for cause, nor did it make note of any lack of performance, individually or company-wide. Indeed, at no time were any issued raised about Baker's performance.

48. At the December 8, 2017 meeting, Perspecta did not articulate any reason for its decision to terminate Baker's employment. Perspecta would only state that Baker's employment was "ending", despite Baker's request for clarity or rationale during the meeting. No Board member, other than Montrone, spoke at the meeting while Mr. Baker was in attendance.

49. Upon information and belief, Perspecta's Board of Directors is not an independent body, but is controlled heavily by Montrone and Meister. All, or almost all, of Perspecta's then-current Board Members were Montrone's former long-time employees and had been beholden to Montrone over their careers.

50. As a result of Montrone, Meister, and Perspecta's discrimination, harassment and retaliation against Baker, Baker has suffered significant harm, physically, emotionally and financially.

### IV. Baker Exhausted His Administrative Remedies

51. On January 30, 2018, Baker filed a Charge of Discrimination with the New Hampshire Commission for Human Rights ("HRC") and the Equal Employment Opportunity Commission ("EEOC").

52. On July 27, 2018, Baker filed a request with the EEOC that it issue a Notice of Right to Sue following the expiration of the 180-day period of the EEOC/HRC investigation so that Baker could pursue his claims in court.

53. On August 1, 2018, following the expiration of the 180-day period, the EEOC provided Baker with a Notice of Right to Sue. A true and correct copy of the Notice of Right to Sue is attached hereto as <u>Exhibit A</u>.

54. On August 2, 2018, following issuance of the Notice of Right to Sue by the EEOC, the HRC closed its case file. A true and correct copy of the HRC's August 2, 2018 correspondence is attached hereto as <u>Exhibit B</u>.

55. Baker has exhausted his administrative remedies in connection with his claims under the ADA and New Hampshire Law Against Discrimination.

## COUNT I
### Retaliation in Violation of 42 U.S.C. § 12101 *et. seq*. and RSA 354-A
(Against Montrone, Meister and Perspecta)

56. Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-55 above, as if set forth fully herein.

57. On or about May 1, 2017, Baker engaged in a protected activity when, in accordance with Perspecta's documented policy statement, he met with Montrone and expressed concerns regarding the discrimination he faced and the hostile work environment he encountered at Perspecta.

58. Within two weeks of voicing his concerns to Montrone about Meister's behavior, Montrone told Baker that his future with Perspecta was in jeopardy because he and Meister had determined that Baker "wasn't the right guy."

59. Thereafter, Montrone placed constant pressure on Baker to resign.

60. After months of unsuccessful effort to force Baker to resign, Montrone, Meister and Perspecta's Board of Directors terminated Baker's employment.

61. Perspecta, Montrone, and Meister terminated Baker in retaliation for Baker's effort to voice concerns about Meister's discriminatory treatment of him.

62. Baker was not provided with any performance-based or other reasons for his termination. Indeed, when Baker specifically asked the Board of Directors for the reasons and rationale behind his termination, his question went unanswered.

63. As a result of Montrone's, Meister's and Perspecta's actions, Baker has suffered and will continue to suffer harm, including physical, emotional and financial harm.

4828-4145-2404.7

## COUNT II
### Discrimination in Violation of 42 U.S.C. § 12101 *et. seq*. and RSA 354-A
**(Against Perspecta)**

64. Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-63 above, as if set forth fully herein.

65. At all relevant times, Baker was a qualified individual with a disability (or was regarded as an individual with a disability) and/or was associated with family members suffering from disabilities and/or regarded as suffering from disabilities.

66. By January 2016 at the latest, Perspecta knew Baker's family members were suffering from physical and mental disabilities (real or perceived), and upon information and belief knew Baker was suffering as a result of the trauma he was enduring in his personal life. Perspecta also knew, as of January 2016, that Baker was taking medication and that his previous attempts to try alternative medications were unsuccessful. Upon information and belief, Perspecta knew Baker was suffering from a disability (real or perceived) and/or regarded Baker as an individual suffering from a disability (real or perceived).

67. At all relevant times, Baker was able to perform the essential functions of his job, with or without reasonable accommodation, and was indeed performing the essential functions of his job with Perspecta.

68. Baker was treated differently by Perspecta on account of his disability (real or perceived) and/or because Perspecta regarded Baker as disabled and/or on account of his association with his family members who were suffering from disabilities (real or perceived).

69. Baker was pressured to resign from Perspecta on account of his disability (real or perceived) and/or because he was regarded as disabled and/or on account of his association with his family members who were suffering from disabilities (real or perceived).

70. Perspecta wrongfully terminated Baker's employment on account of his disability (real or perceived) and/or because it regarded Baker as disabled and/or on account of Baker's association with his family members who were suffering from disabilities (real or perceived).

71. As a result of Perspecta's actions, Baker has suffered and will continue to suffer harm, including physical, emotional and financial harm.

## COUNT III
### Hostile Work Environment in Violation of 42 U.S.C. § 12101 *et. seq*. and RSA 354-A
(Against Perspecta)

72. Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-71 above, as if set forth fully herein.

73. Perspecta fostered a work environment that was hostile towards individuals with disabilities. Indeed, those who did not meet the definition of "robust and healthy" had no place within the company.

74. Upon information and belief, Perspecta knew Baker was suffering from a disability and/or regarded Baker as an individual suffering from a disability and knew that Baker associated with family members who were suffering from disabilities (real or perceived).

75. Baker was subjected to an environment, fostered by Meister and Montrone, which was intimidating, hostile and abusive and included behavior such as outwardly discriminating against individuals whom Perspecta suspected suffered from physical or mental health disabilities, subjecting prospective employees who had been offered employment to company-required physical examinations, Meister's disassociation from Baker and exclusion of Baker from aspects of the business he was tasked to oversee, pressuring Baker to resign and ultimately terminating Baker's employment.

76. Baker found the environment at Perspecta hostile, and Perspecta's environment would be considered objectively offensive to others.

77. As a result of Perspecta's actions, Baker has suffered and will continue to suffer harm, including physical, emotional and financial harm.

## COUNT IV
### Aiding and Abetting in violation of RSA 354-A
**(Montrone and Meister)**

78. Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-77 above, as if set forth fully herein.

79. At all relevant times, Montrone and Meister fostered an environment at Perspecta that was hostile to individuals with disabilities.

80. Montrone and Meister aided and abetted Perspecta's discriminatory treatment of Baker by directly treating Baker in a disparate manner and actively participating in the decision to terminate his employment.  Indeed, after Baker voiced his concerns regarding the discriminatory treatment he was receiving at Perspecta, Montrone and Meister decided Baker "wasn't the right guy" for Perspecta, rather than working to address Baker's concerns about Perspecta's discriminatory and hostile work environment and its potential impact on Perspecta's business.

81. Upon information and belief, Montrone and Meister urged the Perspecta Board of Directors to terminate Baker's employment.

82. As a result of Montrone and Meister's actions, Baker has suffered and will continue to suffer harm, including physical, emotional and financial harm.

**Plaintiff Scott Baker demands a jury trial on all counts so triable.**

WHEREFORE, Plaintiff Scott Baker respectfully seeks an order:

A. Entering judgment in favor of Baker on Count I of his Complaint;

B. Entering judgment in favor of Baker on Count II of his Complaint;

C.  Entering judgment in favor of Baker on Count III of his Complaint;

D.  Enter judgment in favor of Baker on Count IV of his Complaint;

E.  Awarding Baker reinstatement of his position as President of Perspecta Trust effective December 8, 2017 with no break in service and with the same rights and benefits as if he had never been terminated;

F.  Awarding Baker monetary damages, including but not limited to, lost wages (past and future), emotional distress damages and other compensatory damages as this Court deems just and proper;

G.  Awarding Baker enhanced compensatory and punitive damages as allowable;

H.  Awarding Baker his costs, expenses, attorneys' fees and interest; and,

I.  Awarding such other and further relief as this Court deems just and proper.

Respectfully submitted,

SCOTT BAKER,
By his attorneys,

*/s/Beth A. Deragon*
Beth A. Deragon (#16347)
Terri L. Pastori (#12136)
PASTORI | KRANS, PLLC
70 Commercial Street, Suite 203
Concord, NH 03301
Telephone (603) 369-4769
bderagon@pastorikrans.com
tpastori@pastorikrans.com

Jennifer B. Furey (BBO # 634174)
motion for *pro hac vice admission to be filed*
Jennifer L. Mikels (BBO # 682199)
motion for *pro hac vice admission to be filed*
GOULSTON & STORRS PC
400 Atlantic Avenue
Boston, Massachusetts 02110-3333
Telephone (617) 482-1776
Facsimile (617) 574-4112

4828-4145-2404.7

                    jfurey@goulstonstorrs.com
                    jmikels@goulstonstorrs.com

Dated: <u>October 6, 2018</u>

**4828-4145-2404.7**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the above date.

                                                    */s/Teri L. Pastori*
                                                   Teri L. Pastori

4828-4145-2404.7