## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| SCOTT BAKER,<br><br>　　　　Plaintiff,<br><br>v.<br><br>PAUL MONTRONE, PAUL MEISTER, PERSPECTA TRUST, LLC, BAYBERRY FINANCIAL SERVICES CORP., and LIBERTY LANE SERVICE COMPANY LLC.<br><br>　　　　Defendants. | Civil Action No. 1:18-CV-00913-PB |

## DISCOVERY PLAN
### Fed. R. Civ. P. 26(f) and L.R. 26.1

**DATE/PLACE OF CONFERENCE:**

Pursuant to Fed. R. Civ. P. 26(f), the parties, through counsel, held a conference via telephone on November 9, 2018.

**COUNSEL PRESENT/REPRESENTING**:

For Plaintiff Scott Baker: **Attorneys Jennifer B. Furey (admitted *pro hac vice*) and Jennifer L. Mikels (admitted *pro hac vice*).**

For Defendants Paul Montrone, Paul Meister, Perspecta Trust LLC, Bayberry Financial Services Corp. and Liberty Lane Services Corp.: **Attorneys Mark T. Broth and Meghan S. Glynn.**

4839-2087-9738.4

**CASE SUMMARY**

**THEORY OF LIABILITY:** In 2009, Perspecta[1] hired Baked as a Principal. Baker began his employment at Perspecta on May 11, 2009, and he served successfully as a Principal of Perspecta through the beginning of 2013. In May 2013, Perspecta's Board of Directors appointed Baker President of Perspecta.

Throughout the course of his employment, Baker reported to Paul Montrone ("Montrone") and Paul Meister ("Meister") – Perspecta's co-founders and majority owners. Montrone served as Perspecta's CEO, President (until succeeded by Baker) and Chairman of the Board. Meister served as Perspecta's Vice-Chairman of the Board. As both Principal and President of Perspecta, Baker, working under Messrs. Montrone and Meister, ran the day-to-day operations of the company, as well as implemented the company's strategic plan. His primary duties consisted of client solicitation, client management, marketing, Board of Director and owner interaction, and the recruiting, hiring and management of employees. Baker also had principal responsibility for the company's financial performance.

Montrone and Meister strove to ensure that Perspecta's workforce was "robust and healthy." During Baker's tenure at Perspecta, he observed that if an employee or prospective employee did not fit that model, there would be no place for them within the building (Perspecta and related entities). Indeed, on or about April 14, 2009, prior to commencing employment with Perspecta, Baker himself was subjected to a 3-hour psychological assessment for purposes of pre-employment evaluation, and, for a period of time, Perspecta required all prospective

---

[1] Defendants Perspecta Trust LLC, Bayberry Financial Services Corp. and Liberty Lane Service Company LL are referred to collectively herein as "Perspecta."

employees offered a job to undergo pre-employment medical exams, regardless of whether their job required physical activity.

Beginning in 2015, Baker and his family members (wife and daughter) began experiencing physical and mental health challenges. In or around December 2015, as a result of his struggle to cope with his wife and daughter's disabilities, Baker himself began experiencing significant anxiety and depression, which caused him to have difficulty sleeping, eating, concentrating and interfacing with others, despite his continuous efforts to treat and improve his condition. Though Baker sought medical treatment and tried numerous medications, his symptoms persisted throughout 2016 and well into 2017.

In January 2016, Montrone informed Baker that his equity plan in Perspecta was being terminated, under the auspices of a new and much better plan coming in the future. In the weeks following this notice, Baker attended a meeting with Montrone to discuss the termination of his equity plan, and the corresponding buy-out price of such. During this meeting, Baker became emotional and visibly upset, and he explained to Montrone the trauma he was undergoing in his personal life. He spoke openly and candidly with Montrone about his wife and daughter's persistent physical and mental disabilities. Baker also stated that he was not in a position to negotiate with Montrone about the terms of his equity redemption, as he wished to focus on his family's health, and that he trusted Montrone to do the right thing and live up to the commitments and representations he made about a replacement equity plan. In January 2016, Perspecta's Chief Financial Officer was inappropriately informed that Baker was taking an expensive prescription medication and that Baker had tried alternative medication that were not successful in treating his conditions.

As Baker's health and the heath of his family members deteriorated, so too did the treatment he received at work.  Meister began disassociating himself from Baker, excluding Baker from client meetings, communications, conducting business behind Baker's back and without his approval, and ultimately ceasing all direct communications with him.

On or about May 1, 2017, Baker met with Montrone to express his concerns regarding the manner in which Meister was treating him in the workplace.  Baker voiced his concerns to Montrone because not only was Meister's treatment discriminatory, but Baker was concerned about the impact Meister's conduct was having on the business and its clients.

On or about May 15, 2017, two weeks after Baker approached Montrone regarding his concerns, Montrone met with Baker and informed him that his future with Perspecta was in jeopardy.  When Baker asked Montrone for an explanation as to why his future with Perspecta was uncertain, Montrone simply told Baker that he and Meister determined that Baker "wasn't the right guy."  Montrone made no reference to any wrongdoing or performance deficiencies on Baker's part.

After this meeting, Baker continued to experience disparate treatment and a hostile work environment, which included but was not limited to Montrone and Meister treating him differently, refusing to work with him, and making repeated efforts to get Baker to resign his employment.

On December 1, 2017, Perspecta's counsel informed Baker that his last day of employment would be December 8, 2017.  Despite this, Defendant continued to pressure Baker to resign – even going so far as to list Baker's "resignation" as an agenda item on a draft document for the December 8, 2017 Board of Directors meeting.  Upon seeing this agenda item, Baker sent a letter to Montrone, as Chairman of the Board, copying the other Board members,

informing them that he had not resigned, had no intention of resigning, and wished to continue to lead Perspecta.

On December 8, 2017, Baker attended the beginning of the Board of Directors meeting, Perspecta told Baker that his employment was "ending." At the December 8, 2017 meeting, Perspecta did not articulate any reason for its decision to terminate Baker's employment. Rather, Perspecta would only state that Baker's employment was "ending," despite his request for clarity or rationale during the meeting. At no point following the onset of Baker's disability in 2015 did Montrone, Meister or the Perspecta Board provide any negative feedback to him, nor did they make note of any unsatisfactory performance by Baker personally or the company broadly. Indeed, at no point during the course of Baker's employment did the Board ever receive negative feedback or provide negative feedback regarding Baker's performance. In fact, under Baker's leadership, Perspecta's business thrived. Revenues increased each year – achieving record highs in 2017, its client base expanded broadly, and Perspecta was named as one of the Top 5 Trust Companies in the World by the Society for Trust and Estate Practitioners in 2015, 2016 and 217. Perspecta Trust was also named Trust Company of the Year in the United States in 2015 by Private Wealth Report.

Baker will prove that Montrone and Meister terminated his employment in retaliation for his effort to voice concerns about Meister's discriminatory treatment of him. He will further prove that Perspecta wrongfully terminated his employment in violation of § 12101 *et. seq.* and RSA 354-A on account of his disability (real or perceived), and/or because it regarded Baker as disabled and/or on account of Baker's association with his family members who were suffering from disabilities (real or perceived). Finally, Baker will establish that he was subjected to a hostile work environment in violation of 42 U.S.C § 12101 *et. seq.* and RSA 354A and that

4

Montrone and Meister aided and abetted Perspecta's discriminatory treatment of him by directly treating him in a disparate manner and actively participating in the decision to terminate his employment.

**THEORY OF DEFENSE:** Perspecta Trust[2] provides trust operation and management services for ultra-high net-worth individuals and their families, including both domestic and international clients. Perspecta Trust offers personalized peer to peer, investment and wealth advisory services. Perspecta was founded in 2007 by Paul Montrone and Paul Meister.

Mr. Baker was hired in the spring of 2009.  In early 2013, Mr. Baker was appointed President of Perspecta Trust. Mr. Montrone continued in his roles of CEO and Chairman of the Perspecta Trust Board and Mr. Meister continued in the role of Vice-Chairman.  Not long after Mr. Baker's promotion, it became clear to Mr. Montrone and Mr. Meister that Mr. Baker was not a natural fit for the position of President. However, and despite their strong reservations, they decided to give Mr. Baker additional time in which to prove himself.

Mr. Baker's performance did not improve.  In October 2014, Mr. Montrone insisted that Mr. Baker undergo a "360 Evaluation." The intent of the 360 Evaluation was to provide both the Company and Mr. Baker with a holistic view of his performance and how he was perceived by his colleagues.  The results of the 360 Evaluation demonstrated that there were significant deficiencies in Mr. Baker's leadership skills. Upon receipt of the 360 Evaluation, Mr. Montrone informed Mr. Baker that he was viewed by his subordinates, peers and superiors as deceptive, egotistical and untrustworthy. Mr. Montrone informed Mr. Baker that this was unacceptable and that he needed to change these perceptions.

---

[2] Defendants adopt Plaintiffs' use of the term "Perspecta" to encompass all of the Defendants. However, Defendants use the term "Perspecta Trust" to signify that only Defendant Perspecta Trust, LLC was involved in a particular action.

Over the next two years, Messrs. Montrone and Meister allowed Mr. Baker ample opportunity to demonstrate improvement in both organizational leadership and client management. Neither saw the desired improvement. However, during this time period Mr. Montrone became generally aware that Mr. Baker's wife had a serious health condition.  Out of concern for Mr. Baker and his family, and despite Mr. Meister's and Mr. Montrone's determination that Mr. Baker lacked the skills necessary to successfully perform the duties of President, Mr. Montrone delayed discussing an end to the employment relationship.

By May 2017, Mr. Montrone agreed with Mr. Meister that Mr. Baker's performance had not sufficiently improved and that it was necessary to find new leadership for Perspecta Trust. On or about May 15, 2017, Mr. Montrone informed Mr. Baker that he had failed to demonstrate the requisite improvement and that he should start searching for other employment opportunities. Mr. Baker was told that he would receive his full salary and benefits, as well as eligibility for a partial bonus based on Company performance, for up to one year or until he secured new employment, whichever occurred sooner.   At the time, Mr. Meister was the only other person who knew of Mr. Montrone's conversation with Mr. Baker.

Sometime during the summer of 2017, Mr. Baker informed Perspecta that the non-compete agreement he had signed upon hire (and subsequently amended) was hindering his ability to secure new employment. Perspecta agreed to modify the non-compete for Mr. Baker's benefit and, through an exchange of proposals, believed that they had reached agreement of a modified non-compete.  However, by September 2017, Mr. Baker's relationship with Perspecta became adversarial.   He engaged legal counsel to challenge the enforceability of the non-compete agreement. In October 2017, Mr. Baker rejected all proposed severance terms.

On December 1, 2017, after having made no headway in negotiating severance terms or in modifying the non-compete agreement, Mr. Baker was informed that he would be terminated effective December 8, 2017 unless an agreement could be reached before that date. On December 8, 2017, the Board removed Mr. Baker from his position as President and his termination took immediate effect.

Perspecta will show that Mr. Baker cannot meet his burden of proof on any of his claims. Specifically, Perspecta will show that Messrs. Montrone and Meister were not aware that either Mr. Baker or his daughter had a disability, real or perceived. Perspecta will also establish that, while the Company was generally aware that Mrs. Baker was experiencing health challenges, Mr. Baker did not experience any adverse employment action taken as a result of the Company's knowledge of Mrs. Baker's disability. Perspecta will demonstrate that Baker was terminated based on demonstrated performance problems, including a perceived lack of trustworthiness as stated by his peers, subordinates and superiors. Perspecta will establish that it did not wrongfully terminate Baker's employment in violation of § 12101 *et. seq.* and RSA 354-A because of his disability (real or perceived), and/or because it regarded Baker as disabled and/or on account of Baker's association with his family members who were suffering from disabilities (real or perceived). Further, Perspecta will show that Baker was not subjected to a hostile work environment in violation of 42 U.S.C § 12101 *et. seq.* and RSA 354-A, nor did Messrs. Montrone and Meister aid and abet Perspecta's alleged discriminatory treatment of Mr. Baker because no such discriminatory treatment occurred.

**DAMAGES:** Baker is entitled to damages resulting from Defendants' discriminatory, retaliatory and hostile conduct and from Montrone and Meister's aiding and abetting such conduct, including but not limited to his attorneys' fees, costs and interest. Baker's damages

continue to accrue, remain the subject of discovery and are in a total amount to be determined at trial.

**DEMAND**:

    Due no later than July 1, 2019.

**OFFER**:

    Due no later than July 8, 2019.

**JURISDICTIONAL QUESTIONS:**

    No jurisdictional questions are anticipated.

**QUESTIONS OF LAW:**

    *See* Theory of Liability and Theory of Defense.

**TYPE OF TRIAL**:

    Jury Trial.

## **SCHEDULE**

**TRACK ASSIGNMENT:**    Standard – 12 Months.

**TRIAL DATE:** During the week of December 3, 2019, or as the Court's calendar permits.

**DISCLOSURE OF CLAIMS AGAINST UNNAMED PARTIES:** April 19, 2019.

**AMENDMENT OF PLEADINGS:** April 30, 2019.

**JOINDER OF ADDITIONAL PARTIES:** April 30, 2019.

**THIRD-PARTY ACTIONS**: April 30, 2019.

4839-2087-9738.4

**MOTIONS TO DISMISS:** Not applicable.  Defendants answered the Complaint on October 31, 2018.

**DATES OF DISCLOSURE OF EXPERTS AND EXPERTS' WRITTEN REPORTS AND SUPPLEMENTATIONS:**

    **Plaintiff's Initial Expert Disclosure and Reports:** May 3, 2019.

    **Defendants' Initial Expert Disclosure and Reports:** June 3, 2019.

    **Supplemental Expert Reports by both parties:** July 1, 2019.

**COMPLETION OF DISCOVERY:**  July 31, 2019.

**MOTIONS FOR SUMMARY JUDGMENT:**  August 5, 2019.

**CHALLENGES TO EXPERT TESTIMONY:** October 18, 2019.

## DISCOVERY

**DISCOVERY NEEDED:**  The parties anticipate that discovery concerning all claims and defenses is necessary.

**MANDATORY DISCLOSURES (Fed. R. Civ. P. 26(a)(1)):**  The parties have agreed to waive the initial disclosures required by Fed. R. Civ. P. 26(a)(1).

**INTERROGATORIES**: A maximum of 25 interrogatories by each party to any other party.  Responses due 30 days after service unless otherwise agreed to pursuant to Fed. R. Civ. P. 29.

**REQUESTS FOR ADMISSION:** A maximum of 30 requests for admission by each party to any other party.  Responses due 30 days after service unless otherwise agreed to pursuant to Fed. R. Civ. P. 29.

4839-2087-9738.4

**DEPOSITIONS:** A maximum of 10 depositions of fact witnesses by each party, subject to change based on initial disclosures. Each deposition shall be limited to seven hours unless extended by agreement of the parties or order of the Court.

**ELECTRONIC INFORMATION DISCLOSURES (Fed. R. Civ. P. 26(f)):** The parties agree to the following procedures:

    1.    **Preservation:** The parties agree to preserve any relevant electronic discovery in locations where the responsive discovery reasonably might be found including, but not limited to on any computers, cell phones or other personal or business storage devices. Without waiving any rights with respect to documents that may have been destroyed prior to the date of this agreement, the parties agree to suspend any applicable document retention policy he/it may employ in order to preserve any relevant data.

    2.    **Email Information:** The parties agree to preserve email data in the same manner as all other relevant, electronically stored data. The Defendants agree that they will search for and produce, to the extent requested, any email communications that may be stored in their back-up or archival databases, to the extent reasonably accessible.

    3.    **Back-up and Archival Data:** To the extent responsive back-up or archival data exists, the parties agree to meet and confer regarding the production of such data. The producing party shall bear the cost of obtaining such data.

    4.    **Production:** The parties will comply with all local and federal rules regarding electronic discovery. To the extent electronically-stored information ("ESI") is produced in this case, the parties agree that all ESI will be produced as multi-page Group IV TIFF files. If color is necessary to understand the content of a document, that document should be produced in color

format. For all images, image resolution should be at least 300 DPI. A document-level text file should be produced for every document, and document metadata should be provided. For any processed native files, the original text should be produced. OCR should be included for scanned paper documents, native documents that did not have extracted text, and redacted documents. In certain circumstances, including Excel spreadsheet, database files, and video or sound files, a TIFF image cannot be created or the images will not accurately represent the 'native" version of the file. In such instances, the file should be produced in native format with a placeholder image.

5. **Reasonably Accessible Information and Costs:** Counsel will determine if any electronic discovery is not reasonably accessible and whether obtaining such information presents an undue burden or cost.

6. **Privileged or Trial Preparation Materials:** Inadvertent production of any electronic discovery that a party later claims should not have been produced because of privilege, including but not limited to attorney-client privilege, work product doctrine or some other applicable rule of privilege or disqualification, will not be deemed to waive a later claim to its privileged or confidential nature. Any party producing electronic material in connection with this action, including any non-party producing material in connection with this action, (a "producing party") may request the return of any inadvertently produced privileged electronic discovery. The request for the return of inadvertently produced electronic discovery shall identify the discovery inadvertently produced and the basis for withholding such discovery from production. Unless the party (or non-party) receiving such material (a "receiving party") disputes the claim that the material was inadvertently produced, the receiving party shall, within five (5) business days of such request, return to the producing party or destroy at the producing

party's option (with confirmation of such destruction to be provided) the inadvertently produced electronic discovery and all copies thereof.  If the receiving party disputes the producing party's claim to invoke the protections of this paragraph, the receiving party shall, within five (5) business days, write a letter to all parties setting forth its good faith reason for such dispute.  If the issue cannot be resolved between the parties, the producing party may then move the Court to rule on the materials' status.  The parties shall have the benefit of all limitations on waiver afforded by Federal Rules of Civil Procedure and Federal Rules of Evidence.  Any inadvertent disclosure of privileged information shall not operate as a waiver in any other federal or state proceeding, and the parties' agreement regarding the effect of inadvertent disclosure of privileged information shall be binding on nonparties.  Inadvertently produced material reclaimed by this Stipulation shall not be utilized by the receiving party in any way in this action or otherwise.

**STIPULATION REGARDING CLAIMS OF PRIVILEGE/PROTECTION OF TRIAL PREPARATION MATERIALS (Fed. R. Civ. P. 26(f)):**

The parties agree that inadvertent disclosure by a party or non-party of material that should have been withheld from disclosure on the grounds of attorney-client privilege, work product, or some other applicable rule of privilege or disqualification ("Privileged Material") shall not waive any privilege, disqualification or other applicable protective doctrine for that material if the producing party, upon becoming aware of the disclosure, promptly requests its return.  Any producing party may request the return of any inadvertently produced Privileged Material.  The request for the return of inadvertently produced Privileged Material shall identify the material inadvertently produced and the basis for withholding such material from production.  Unless the receiving party disputes the claim that the material was inadvertently produced, the receiving party shall, within five (5) business days of such request, return to the producing party

**4839-2087-9738.4**

or destroy at the producing party's option (with confirmation of such destruction to be provided), the inadvertently produced electronic discovery and all copies thereof.  If the receiving party disputes the producing party's claim to invoke the protections of this Stipulation, the receiving party shall, within five (5) business days, write a letter to all parties setting forth its good faith reason for such dispute.  If the issue cannot be resolved between the parties, the producing party may then move the Court to rule on the materials' status.  The parties shall have the benefit of all limitations on waiver afforded by Federal Rules of Civil Procedure and Federal Rules of Evidence.  Any inadvertent disclosure of privileged information shall not operate as a waiver in any other federal or state proceeding, and the parties' agreement regarding the effect of inadvertent disclosure of privileged information shall be binding on nonparties.  Inadvertently produced material reclaimed by this Stipulation shall not be utilized by the receiving party in any way in this action or otherwise.  Fed. R. Civ. P. 26(b)(5)(B) shall apply.

### OTHER ITEMS

**SETTLEMENT POSSIBILITIES:** Settlement cannot be evaluated until August 1, 2019.

**JOINT STATEMENT RE: MEDIATION:** The parties will notify the Court if mediation will occur, and the date of any scheduled mediation, on or before August 1, 2019.

**TRIAL ESTIMATE:**  5 days.

**WITNESSES AND EXHIBITS:**  Witness and exhibit lists, included in final pretrial statements, are due ten (10) days before the final pretrial conference but not less than 30 days before trial.  Objections are due fourteen (14) days after service of final pretrial statements.  Formal dates to be set by Clerk's Notice of Trial Assignment.

**4839-2087-9738.4**

**PRELIMINARY PRETRIAL CONFERENCE:** The parties do not request a preliminary pretrial conference with the Court before entry of the scheduling order.

Respectfully submitted,

| | |
|---|---|
| SCOTT BAKER,<br>By his attorneys, | PAUL MONTRONE, PAUL MEISTER, PERSPECTA TRUST LLC, BAYBERRY FINANCIAL SERVICES CORP., and LIBERTY LANE SERVICES CORP.,<br>By their attorneys, |
| */s/Jennifer L. Mikels*<br>Terri L. Pastori (NH Bar #12136)<br>Beth A. Deragon (NH Bar #   )<br>PASTORI \| KRANS, PLLC<br>70 Commercial Street, Suite 203<br>Concord, NH 03301<br>(603) 369-4769<br>tpastori@pastorikrans.com<br>bderagon@pastorikrans.com<br><br>Jennifer B. Furey (BBO # 634174)<br>Admitted *pro hac vice*<br>Jennifer L. Mikels (BBO # 682199)<br>Admitted *pro hac vice*<br>GOULSTON & STORRS PC<br>400 Atlantic Avenue<br>Boston, Massachusetts 02110-3333<br>Telephone (617) 482-1776<br>Facsimile (617) 574-4112<br>jfurey@goulstonstorrs.com<br>jmikels@goulstonstorrs.com | */s/Mark T. Broth*<br>Mark T. Broth (NH Bar # 279)<br>Meghan S. Glynn (NH Bar #21168)<br>Drummond Woodsum & MacMahon, P.A.<br>1001 Elm St., Suite 303<br>Manchester, NH 03103<br>(603) 716-2895<br>mbroth@dwmlaw.com<br>mglynn@dwmlaw.com |

Dated: November 23, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the above date.

                                      */s/Jennifer L. Mikels*
                                      Jennifer L. Mikels

4839-2087-9738.4