## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

SCOTT BAKER,

      Plaintiff,

v.

PAUL MONTRONE, PAUL MEISTER,
PERSPECTA TRUST, LLC, BAYBERRY
FINANCIAL SERVICES CORP.,
LIBERTY LANE SERVICE COMPANY
LLC, PERSPECTA HOLDINGS LLC,
PERSPECTA ENTITIES LLC, and
PERSPECTA INVESTMENTS LLC.

      Defendants.

Civil Action No. 1:18-CV-00913-PB

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Scott Baker, by and through his undersigned counsel, hereby files his amended

complaint against Defendants Paul Montrone, Paul Meister, Perspecta Trust, LLC, Bayberry

Financial Services Corp., Liberty Lane Service Company LLC, Perspecta Holdings LLC,

Perspecta Entities LLC and Perspecta Investments LLC (collectively, "Defendants") arising from

Defendants' unlawful conduct during Baker's employment with and termination from

Defendants Perspecta Trust LLC, Bayberry Financial Services Corp., and Liberty Lane Service

Company (collectively "Perspecta"), and alleges as follows:

### PARTIES

1.     Plaintiff Scott Baker ("Plaintiff" or "Baker") is an individual residing in North

Hampton, New Hampshire.

2.     Defendant Paul Montrone ("Montrone") is an individual residing and working in

the State of New Hampshire.

3.      Defendant Paul Meister ("Meister") is an individual residing and working in the State of New Hampshire.

4.      Defendant Perspecta Trust LLC ("Perspecta Trust") is a New Hampshire limited liability company with its principal place of business located at 1 Liberty Lane, Hampton, New Hampshire.

5.      Defendant Bayberry Financial Services Corp. ("Bayberry") is a corporation formed under the laws of the State of Delaware with a principal place of business located at 1 Liberty Lane, Hampton, New Hampshire.

6.      Defendant Liberty Lane Service Company LLC ("Liberty Lane" and collectively with Perspecta Trust and Bayberry, "Perspecta") is a limited liability company organized under the laws of the State of Delaware with a principal place of business located at 1 Liberty Lane East, Ste 100, Hampton, New Hampshire.

7.      Defendant Perspecta Holdings LLC ("Perspecta Holdings") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 1 Liberty Lane, Hampton, New Hampshire.

8.      Defendant Perspecta Entities LLC ("Perspecta Entities") is a Delaware limited liability company with its principal place of business located at 1 Liberty Lane, Hampton, New Hampshire.

9.      Defendant Perspecta Investments LLC ("Perspecta Investments") is a Delaware limited liability company with its principal place of business located at 1 Liberty Lane, Hampton, New Hampshire.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Baker's claims under the ADA, 42 U.S.C. § 12101 *et. seq*. pursuant to 28 U.S.C. § 1331.

11.     This Court has supplemental jurisdiction over Baker's additional claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

13.     In 2007, Montrone and Meister formed Perspecta Trust, a state-regulated, New Hampshire-based, non-depository trust company based in Hampton, New Hampshire (its sole location).  Perspecta Trust provides various trustee services, as well as investment management, estate planning, wealth transfer planning and other family services.

14.     In 2009, Baker, while living in Connecticut, was contacted by an independent recruiter acting on behalf of Perspecta, to explore a leadership role that Perspecta had been looking to fill for some time.  At the time, Perspecta was a start-up company with no external clients, looking to expand its business.

15.     On April 30, 2009, Perspecta extended a job offer to Baker.  Baker's offer to join Perspecta included an express commitment to grant Baker a meaningful equity stake in the business.  Specifically, in addition to his base and annual discretionary bonus compensation, Perspecta's offer to Baker promised that "on your start date you will initially be awarded stock options representing 3% of the equity of Perspecta over and above a base starting value of $15,000,000 . . . Additional grants will be considered in the future on a periodic basis as recommended by the Compensation Committee."

4842-4592-1938.4

16.     After a series of negotiations, Baker accepted Perspecta's offer to join Perspecta as a Principal, and he moved from Connecticut in time for his first day of employment on May 11, 2009.

17.     From May 2009 through 2013, Baker successfully served as a Principal of Perspecta.

18.     Despite Perspecta's promise in Baker's offer to grant him an immediate 3% equity stake in the company, this did not occur.  Rather, Perspecta did not create the promised equity plan for Baker until late 2012 – over three years after he joined the firm.

19.     As a result of Baker's success at Perspecta, and in keeping with promises made to Baker upon his hiring, effective July 2012, Baker was awarded a 20% equity stake in Perspecta Holdings, a valuable holding company, which, among other equity, held ownership interests in Perspecta Trust and a preferred interest in Ballentine Partners, another wealth management firm for which Baker joined the Board of Directors and helped oversee.

20.     Under the July 2012 Equity Award and Admission Agreement ("2012 Equity Award"), Baker became a minority member of Perspecta Holdings, a closely-held LLC, with Meister and two entities controlled by Montrone as the only additional members.  Montrone and Meister served as Perspecta Holdings' co-managers.  Under the terms of the 2012 Equity Award, Baker's equity in Perspecta Holdings vested over a four-year period, and as of January 1, 2015, Baker's 20% equity stake in Perspecta Holdings had fully vested.

21.     On or about April 2, 2013, Perspecta's Board of Directors appointed Baker President of Perspecta, a roll previously held by Montrone.  Upon information and belief, the Board of Directors unanimously made this appointment based on Montrone's recommendation.

22.     In the spring of 2015, after Persepcta received a "Trust Company of the Year" award, Montrone and Baker had a discussion regarding Baker's base salary.  In response to the discussion, Messrs. Montrone and Meister awarded Baker a 25% merit raise, based upon the firm's strong performance.  However, Montrone also told Baker not to focus on his annual compensation, as he wanted Baker to "think like an owner" and recognize that he would be rewarded through his fully-vested equity stake, like his business partners Montrone and Meister.

23.     As both Principal and President of Perspecta, Baker ran the day-to-day operations of the company, as well as implemented the company's strategic plan.  His primary duties consisted of client solicitation, client management, marketing, Board of Director and owner interaction, and the recruiting, hiring and management of employees.  Baker also had principal responsibility for the company's financial performance.

24.     Perspecta is an "employer" within the meaning of 42 U.S.C. § 12111(5).

25.     At all relevant times, Liberty Lane and/or Bayberry operated as Baker's co-employer along with Perspecta Trust.  All three entities shared common management and control over Baker's positions as Principal and then as President.  Montrone and Meister (and associated trusts and entities) are common owners of Perspecta Trust and Liberty Lane.  Montrone (and associated trusts and entities) own and control Bayberry.

26.     Throughout the course of his employment, Baker reported to Montrone and Meister – Perspecta's co-founders and majority owners.  Montrone served as Perspecta's CEO, President (until succeeded by Baker) and Chairman of Perspecta Trust's Board of Directors.  Meister served as Vice-Chairman of Perspecta Trust's Board of Directors.  Montrone has since retaken the Perspecta President's role upon Baker's termination, and today continues as Chairman, CEO and President of Perspecta.

I.      **Perspecta Fostered A Work Environment That Was Hostile To Those With Disabilities**

27.     Montrone and Meister strove to ensure that Perspecta's workforce was robust and healthy.  During Baker's tenure at Perspecta, he observed that if an employee or prospective employee did not fit that model, there would be no place for them within the building (Perspecta and related entities).  Indeed, on or about April 14, 2009, prior to commencing employment with Perspecta, Baker himself was subjected to a 2-hour psychological assessment and testing for purposes of pre-employment evaluation.

28.     In July 2015, after interviewing a prospective candidate, Meister communicated his concerns about the mental health of the applicant in response to Baker's request for post-interview feedback.  Meister commented on the applicant's shaky hands and his assumption that it was caused by depression medication.  Meister suggested staying away from the candidate for this reason alone.

29.     In or around the spring of 2017, Montrone hired an assistant who needed to leave Perspecta after less than a week on the job due to a health condition.  After his assistant left for health reasons, Montrone announced a policy where employees should be young and healthy, if they were to work for him.

30.     Perspecta required some, but not all, prospective employees who were offered a job to undergo pre-employment medical exams, regardless of whether their job required physical activity.  Upon information and belief, the results of these physicals then underwent an elaborate process where they were shared with Montrone for assessment and hiring decision, redacted for sensitive medical information, and then placed into the employee's personnel file.

31.     Perspecta also required some, but not all, prospective employees to undergo a pre-employment psychological evaluation, similar to that taken by Baker, to assess candidates' family background, effects of childhood experiences, and socio-economic status.

## II.     When Baker and His Family Members Suffered From Disabilities, Perspecta Treated Him Differently

32.     Beginning in 2015, Baker and his family members began experiencing physical and mental health challenges.

33.     In September, 2015, Baker's wife was diagnosed with cancer, which required extensive treatment.  In October 2015, she had her first of three surgeries to attempt to remove the cancer, but it was unsuccessful.  Then in November, 2015, Baker's wife began to experience deep depression, which required treatment and medication.  She continued receiving treatment for cancer and depression throughout 2016.  Not only was cancer a catalyst for the depression, but given the nature of the cancer, it was unlikely that she would be able to have children going forward, something that Baker and his wife had been planning.  Furthermore, at the time Baker's wife was diagnosed with cancer, she had been working to start a new consulting business.  As a result of her disabilities she was unable to work and move forward with her plans.

34.      In late 2015, Baker's daughter also began to suffer from mental health issues, which endured throughout 2016 and 2017.  Among many things, this was brought on by cyber-bulling, which she experienced at school, as well as the tragic death of her horse.  Her mental health interfered with her daily life to the extent that she was under suicide watch and it was contemplated that she would leave school in 2016 to try and improve her condition.  Baker's daughter required extensive treatment and medication to treat her disability.

35.     In or around December 2015, as a result of his struggle to cope with his wife's and daughter's disabilities, Baker himself began experiencing significant anxiety and depression.

The depression and anxiety caused Baker to have difficulty sleeping, eating, concentrating, and interfacing with others, despite his continuous efforts to treat and improve his condition.  Though Baker sought medical treatment and tried numerous medications, his symptoms persisted.

36.     In the fourth quarter of 2015, Montrone informed Baker that his equity plan in Perspecta Holdings was being terminated and would be replaced with a new and much better plan.

37.     In January, 2016, following this notice from Montrone, Baker attended a meeting with Montrone wherein Baker wanted to discuss the termination of his equity plan, and the corresponding buy-out price of his vested equity.  During this meeting, Baker became emotional and visibly upset, and he explained to Montrone the various hardships he was undergoing in his personal life.  He spoke openly and candidly with Montrone about his wife and daughter's persistent physical and mental disabilities.  Baker also stated that he was not in an emotional position to negotiate with Montrone about these terms, as he wished to focus on his family's health, and that he trusted Montrone to do the right thing and live up to the commitments and representations he made about the improved replacement equity plan.

38.     In or around January 2016, Perspecta's Chief Financial Officer ("CFO") was inappropriately informed that Baker was taking an expensive prescription medication, and that Baker had tried alternative medications that were not successful in treating his conditions. Correspondence regarding Baker's request to Perspecta's self-insured policy for reimbursement for his medication and subsequent correspondence regarding the same with Perspecta's CFO was placed in Baker's personnel file at Perspecta.  Such correspondence indicates that the Perspecta CFO was inappropriately informed of the name of the medication Baker was taking, which was a known anti-depressant.

39.     As Baker's health and the health of his family members deteriorated, so too did the treatment he received at work.

40.     Meister began disassociating himself from Baker, excluding Baker from client meetings and communications, conducting business behind Baker's back and without his approval, and ultimately ceasing all direct communications with Baker despite Baker's repeated attempts to engage him.

41.     For example, at one point Perspecta was approached to undertake an engagement of the spouse of a very significant client.  Baker, in the first instance, objected to Perspecta undertaking an engagement and fiduciary relationship with the spouse, given the actual and potential conflicts of interest between the client and the spouse due to the fact that the two spouses had very different expectations for the disposition of the husband's multi-billion dollar estate upon his passing.  When Baker expressed his concerns regarding this engagement to the Perspecta COO, General Counsel, and other Perspecta staff, Meister intervened, and made the decision to move forward with the new engagement, despite Baker's objections, and despite the inherent risks to the business associated with such significant conflicts of interest.

42.     In addition, Montrone tried to "insulate" Perspecta's clients from Baker due to Montrone's flawed preconceptions about depression.

43.     Though Baker was facing many challenges and a debilitating condition in his personal life, he continued to successfully manage the business, achieving increasingly better results for Perspecta.

44.     Under Baker's leadership, Perspecta's business grew significantly in terms of revenue, profitability, management team and client base.

45.     In March 2015, Perspecta won the award of Best Independent Trust Company at the Family Wealth Report's annual gala in New York City.  Perspecta was selected as the winner of this award by a judging panel of fourteen prominent industry leaders from across the United States, which reviewed and judged Perspecta's qualifications versus that of its US-based peers.

46.     On July 8, 2015, Perspecta was named as one of five finalists in the world (and the only United States based firm named as a finalist) for the Independent Trust Company of the Year award by the Society of Trust and Estate Practitioners' (STEP) Private Client Awards, a global organization considered to be a leader within the estate planning industry.  Perspecta was also named as one of the top five trust companies in the world by STEP in 2016 and 2017.

47.     Revenues increased each year - by approximately 23% in 2016 and achieving a record high in 2017.  In addition, Perspecta began generating more revenue based on investment fees, which were more scalable, profitable and recurring, rather than project-based fees, which did not automatically recur.  As a result, Perspecta's revenue was expected to, and did ultimately continue to, rise.

48.     Perspecta touted the accomplishments achieved with Baker as President in various press releases and took great pride in what it had achieved under Baker's leadership**.**

49.     Baker was able to achieve this success despite his personal hardships and despite certain business practices of Meister and Montrone to which Baker objected, including Montrone's documented practice of routinely and inappropriately expensing exorbitant personal expenses through Perspecta's business accounts, significantly hurting Perspecta's profitability, a metric for which Mr. Baker was accountable.  Montrone also, without consulting anyone on the Perspecta management team or his business partners, unilaterally cut the fees charged to his

family's accounts by almost 50%, cutting the fees his family paid for their extensive services to a level significantly below that of other clients.

50.     At no time following the onset of Mr. Baker's condition, or that of his family members, did Montrone, Meister or the Perspecta Board provide any negative feedback to Baker, nor did they make note of any unsatisfactory performance by Baker personally, or the company broadly.

51.     On or about March 24, 2017, Perspecta's Board of Directors unanimously approved Baker's continuation as Perspecta's President, with no one objecting or raising any concerns.

52.     Despite this success, Meister's treatment of Baker continued to deteriorate.

53.     On or about May 1, 2017, Baker met with Montrone to express his concerns regarding the manner in which Meister was treating him in the workplace.  Baker voiced his concerns to Montrone because not only was Meister's treatment discriminatory, but Baker was also concerned about the impact Meister's conduct was having on the overall business, its clients, and specifically the firm's reputation and risk profile.

**III.     Montrone, Meister And Perspecta Retaliate Against Baker**

54.     On or about May 15, 2017, roughly two weeks after Baker approached Montrone with concerns regarding Meister's discriminatory treatment and its potential impact on the business, Montrone met with Baker and informed him that his future with Perspecta was in jeopardy.  When Baker asked Montrone for an explanation as to why his future with Perspecta was uncertain, Montrone simply told Baker that he and Meister determined that Baker "wasn't the right guy."

55.     Perspecta never told Baker it had concerns regarding his performance, nor did Montrone indicate Baker's performance was suffering during their May 15, 2017 meeting.  Upon information and belief, the minutes and notes from Perspecta's Board of Directors meetings do not reflect that the Board expressed or experienced any dissatisfaction with Baker's performance at any point during Baker's employment.  Indeed, just two months prior, the Board of Directors voted to reappoint Baker as the President of Perspecta, and one month prior, on or about April 13, 2017, Perspecta awarded Baker a discretionary bonus.

56.     Following the May 15, 2017 meeting, Baker continued to experience disparate treatment and a hostile work environment, which included but was not limited to Montrone and Meister treating him differently, and Meister refusing to work with him.

57.     Following the May 15, 2017 meeting, Perspecta placed continuous pressure on Baker to resign.  In the course of negotiations between Baker and Perspecta, Perspecta's counsel repeatedly referenced Baker's "resignation," though Baker continued to impress upon Perspecta that he did not, or plan to, resign.

58.     At the same time, however, Perspecta insisted on the enforcement of restrictive covenants which would prevent Baker from working in the industry in a seven-state area within the northeast, including two years within the State of New Hampshire, and prohibit Baker from soliciting any of Perspecta's current and former clients, as well as employees.  Indeed, Perpecta even presented Baker with a revised non-compete that *expanded* Baker's restrictions and included a mandatory release of claims.  At no time, did Baker object to the provisions of the non-solicit of clients, prospects or employees, but he did seek relief in being able to work within the industry without having to move to another part of the country or to a foreign country.  Perspecta also insisted on a release by Baker of all legal claims against Perspecta.

59.     On December 1, 2017, Perspecta's counsel informed Baker that his last day of employment would be December 8, 2017.

60.     Despite this, Perspecta continued to pressure Baker to resign – even going so far as to list Baker's "resignation" as an agenda item on the Board's agenda being readied for distribution for the December 8, 2017 Board of Directors meeting.

61.     Upon seeing this action item on the agenda, Baker sent a letter to Montrone, as Chairman of the Board, copying the other Board members, informing them that he had not resigned, had no intention of resigning, and wished to continue to lead Perspecta.

62.     On December 8, 2017, Baker attended the beginning of the Board of Directors meeting.  After he advised the attendees that he was not resigning, Perspecta told Baker that his employment was "ending."  Perspecta neither indicated that it was terminating Baker for cause, nor did it make note of any lack of performance, individually or company-wide.  Indeed, at no time were any issues raised about Baker's performance.

63.     Upon information and belief, Perspecta's Board of Directors is not an independent body, but is controlled heavily by Montrone and Meister.  All of Perspecta's then-current Board Members were Montrone's former long-time employees and subordinates, and had been beholden and loyal to Montrone over their careers.

64.     Meister has conceded that as of December 8, 2017, Perspecta considered Baker's termination to be "without cause."  However, as a result of Baker's filing of a Charge of Discrimination with the New Hampshire Commission for Human Rights ("HRC") and the Equal Employment Opportunity Commission ("EEOC"), Perspecta "changed" Baker's termination from one "without cause" to a termination for "cause," as that term is defined in Baker's equity plans.  This "change" has purported to impact Baker's continued equity stake in the company,

and calls for a complete forfeiture of all of Baker's unvested equity interests as of December 8, 2017, rather than full vesting of his equity interests as of December 8, 2017, which would follow a termination "without cause."

65.    As a result of Montrone, Meister, and Perspecta's discrimination, harassment and retaliation against Baker, Baker has suffered significant harm, physically, emotionally and financially.

**IV.    Baker Exhausted His Administrative Remedies**

66.    On January 30, 2018, Baker filed a Charge of Discrimination with the HRC and EEOC.

67.    On July 27, 2018, Baker filed a request with the EEOC that it issue a Notice of Right to Sue following the expiration of the 180-day period of the EEOC/HRC investigation so that Baker could pursue his claims in court.

68.    On August 1, 2018, following the expiration of the 180-day period, the EEOC provided Baker with a Notice of Right to Sue.  A true and correct copy of the Notice of Right to Sue is attached hereto as Exhibit A.

69.    On August 2, 2018, following issuance of the Notice of Right to Sue by the EEOC, the HRC closed its case file.  A true and correct copy of the HRC's August 2, 2018 correspondence is attached hereto as Exhibit B.

70.    Baker has exhausted his administrative remedies in connection with his claims under the ADA and New Hampshire Law Against Discrimination.

**V.    Baker's Equity Stake In the Company**

71.     As noted above, despite commitments in his offer letter that he would be granted immediate equity in Perspecta, Perspecta failed for over three years to award Baker an equity

stake in the company.  Indeed, Perspecta did not award Baker any equity stake in the company

until July 2012, after experiencing substantial progress in the development of the Perspecta

business under Baker's leadership.

72.     Reflecting Baker's success with Perspecta, the 2012 Equity Award was intended

to be extremely valuable to Baker and awarded him a 20% equity stake not only in Perspecta

Trust, but in a holding company, which had ownership interests in, among other business

entities, Perspecta Trust and Ballentine Partners.  Upon information and belief, the size and

scope of the 2012 Equity Award reflected Montrone's and Meister's confidence in, and value

placed on, Baker's leadership and business results over the three previous years and was

intended to reflect the value Baker brought to the business.

73.     As of January 1, 2015, Baker's 20% equity stake in the company was fully-

vested; however, after Baker and his family members began to struggle with several debilitating

medical crises in late 2015, Messrs. Montrone and Meister decided to "restructure" Baker's

equity plan in a manner, which, according to Montrone and Meister, was intended to

purposefully decrease the value of Baker's stake in Perspecta in anticipation of a planned, but

undisclosed, termination.

74.     In or around the fourth quarter of 2015, Montrone informed Baker that he had

plans to restructure Baker's equity in Perspecta Holdings to give more permanence to his

interests and to give Baker what Montrone termed "true equity."  Montrone told Baker that his

new plan would be more similar to that which was used by Ballentine Partners.  Baker

understood his interests would be changed from profits interests (a Class B membership interest)

to capital interests (a Class A membership interest).  Montrone did not tell Baker that there was a

plan was in place to decrease his ownership interest in the company by awarding him different

interests in two smaller entities instead of in Perspecta Holdings.  Nor did he tell Baker that he wanted to terminate Baker's employment with the company.  Nor did Montrone express any dissatisfaction in Baker's performance, or that of the company overall, especially given the company's significant financial improvement or award nominations and receipt.

75.     In the fourth quarter of 2015 and in January 2016, when Montrone discussed with Baker the unilateral termination of the 2012 Equity Award, Montrone did not tell Baker that the intent was to decrease the value of his ownership interest in the company.  Conversely, Montrone conveyed to Baker that he was a valued owner of the company and his vested interests in Perspecta Holdings would be replaced with a new equity structure that would be "much better" financially for Baker and indicated that Baker would welcome the changes — it was sold as a significant upgrade.  Montrone also did not tell Baker that he was going to be terminated.  Rather, Baker was led to believe that he was a valued member of the executive team who was being rewarded through a "much better" equity award.

76.     In January 2016, Montrone met with Baker to discuss the unilateral termination of Baker's 2012 Equity Award and the corresponding buy-out price, which Baker asserted was unreasonably low.  During this meeting, Baker became emotional and visibly upset, even crying, as he explained to Montrone the various hardships he was dealing with in his personal life.  Baker explained to Montrone that he was not in an emotional position to negotiate about the terms of his equity redemption and award, and that he was trusting Montrone to do the right thing and live up to the commitments and representations he made about a "much better" replacement equity plan.

77.     Baker knew that the redemption price Perspecta Holdings was offering him in 2016 for his 20% interest was unreasonably low.  As a reference point, in 2011, Meister

proposed having Baker purchase 15% of Perspecta Holdings for $2 million, valuing the total company at over $13 million. This value was significantly higher than that which was used to redeem Baker's equity interests in 2016 (four years later), when both Perspecta Trust's and Ballentine Partner's financial positions had improved dramatically. Clearly, Montrone and Meister used significantly different metrics to value the business, depending upon whether they were selling their own interests or redeeming that of others for their own benefit.

78.     Notwithstanding this, Montrone assured Baker that as a result of the "much better" replacement plan, Baker would not be harmed by the low redemption price, as his "re-entry" price under the new, better plan would remain at the same low value, a statement that ultimately proved not to be true.

79.     As business partners in a small, closely-held company, Baker took Montrone at his word and trusted him. Accordingly, based on Montrone's representations, Baker signed a Redemption Agreement (the "Redemption Agreement"), effective January 1, 2016, which redeemed his Profits Units in Perspecta Holdings at an unreasonably low price even before Montrone presented Baker any information on his new, "much better" award.

80.     Baker's reliance on Montrone's representations was reasonable given the fiduciary nature of their relationship and given that improving Baker's equity stake in the company was a logical next step as a result of Perspecta's consistent success under Baker's leadership.

81.     Montrone understood that he owed a fiduciary duty to Baker as his business partner in a closely-held entity.

82.     Montrone made the false statements to Baker about the redemption of his equity in Perspecta Holdings and replacement with a financially better plan in an effort to induce Baker

to consent to the redemption of his interests, which he was not required to do, in order to reduce Baker's ownership interest in the company with as little payout as possible by the business, regardless of what payout would have been fair, to avoid a payout to Baker at termination and to ultimately freeze him out of the companies.

83.    Much later in 2016, Montrone presented Baker with his new equity plans; however, rather than presenting Baker with the "much better" plan, as promised, he presented Baker with significantly worse equity awards and plans in two subsidiary companies of Perspecta Holdings, and not at the holding company level.

84.    Specifically, in late 2016 Baker was awarded *unvested* Profits Units (profits interests, not capital interests) in Perspecta Entities and Perspecta Investments, two companies with significantly fewer and less valuable assets than Perspecta Holdings (the "2016 Equity Awards").  Accordingly, rather than having a *vested* 20% stake in Perspecta Holdings, Baker was provided significantly reduced, *unvested* stakes in the smaller entities, which would begin to vest on a new four-year schedule, and which would not fully vest until December 31, 2019, despite Mr. Baker already being fully-vested under his prior equity award.

85.    Rather than a 20% stake in Perspecta Holdings, by December 31, 2019, Baker was set to hold only a 7.1% interest in Perspecta Entities (Perspecta Trust) and a 4.55% interest in Perspecta Investments (preferred interest in Ballentine Partners).

86.     Moreover, as these plans did not go into effect until almost a year after the termination of the 2012 Equity Award and reset Baker's equity stake to zero, Baker lost years' worth of earnings on his vested equity stake in the company.

87.     Baker would not have signed the Redemption Agreement had he known that he was going to be terminated shortly, or that the new equity award would be substantially financially inferior to the 2012 Equity Award, contrary to what he had been told.

88.     The equity plans for Perspecta Entities and Perspecta Investments (the "2016 Equity Plans") provide, that if Perspecta terminated Baker's employment without "Cause," as that term is defined in the 2016 Equity Plans, then any unvested Profits Units held by Baker as of the date of his termination would automatically vest.

89.     As of December 8, 2017, Perspecta did not have "Cause" to terminate Baker's employment and considered his termination to be "Without Cause."  Perspecta went so far as to use a narrative that Baker's employment was "ending", in an effort to avoid the use of the word "terminated", even when Baker enquired as to whether he was being "terminated" during the December 8, 2017 Board meeting.

90.     Perspecta has never issued a written notice to Baker concerning the Cause of his termination or given him any opportunity to cure any alleged acts allegedly constituting Cause.

91.     Montrone has also admitted that Perspecta has not suffered any material harm from any of Baker's alleged actions.

92.     Rather, only after the filing of this lawsuit and as a result of the claims asserted, has Perspecta endeavored to declare Baker's termination to be a termination for Cause as of December 8, 2017.

93.     Prior to his termination on December 8, 2017, Baker held 20,000 vested Profits Units in Perspecta Entities and 12,500 vested Profits Units in Perspecta Investments.

94.     When Baker was terminated without Cause on December 8, 2017, all of his unvested Profits Units in both Perspecta Entities and Perspecta Investments should have

4842-4592-1938.4

automatically vested in accordance with Sections 5.5(b) of the 2016 Equity Plans, meaning that as of December 8, 2017 Baker should have held 80,000 vested Profits Units in Perspecta Entities and 50,000 vested Profits Units in Perspecta Investments.

95.     Upon information and belief, neither Perspecta Entities nor Perspecta Investments properly accelerated the vesting of Baker's Profits Units, or, if they had, they "reversed" the acceleration because of the *post hoc* "Cause" determination and caused Baker to improperly forfeit all unvested Profits Units.

**COUNT I**
**Retaliation in Violation of 42 U.S.C. § 12101 *et. seq*. and RSA 354-A**
**(Against Montrone, Meister and Perspecta)**

96.     Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1- 95 above, as if set forth fully herein.

97.     On or about May 1, 2017, Baker engaged in a protected activity when, in accordance with Perspecta's documented policy statement, he met with Montrone and expressed concerns regarding the discrimination he faced and the hostile work environment he encountered at Perspecta.

98.     Roughly two weeks after voicing his concerns to Montrone about Meister's behavior, Montrone told Baker that his future with Perspecta was in jeopardy because he and Meister had determined that Baker "wasn't the right guy."

99.     Thereafter, Montrone placed constant pressure on Baker to resign, which would have ultimately called for a forfeiture of all of Baker's unvested equity interests and provided the company with the opportunity to purchase Baker's vested equity interests.

100.    After months of unsuccessful effort to force Baker to resign, Perspecta, through Montrone and Meister, terminated Baker's employment and Perspecta's Board of Directors

removed Baker as Perspecta's President all while insisting that he not compete with the company or solicit any of the company's clients, prospective clients or employees.

101.    Perspecta, Montrone, and Meister terminated Baker in retaliation for Baker's effort to voice concerns about Meister's discriminatory treatment of him.

102.    Baker was not provided with any performance-based or other reasons for his termination.   Indeed, when Baker specifically asked the Board of Directors for the reasons and rationale behind his termination, his question went unanswered, only to be told that his "employment was ending".

103.    According to Meister, as of December 8, 2017, Perspecta considered Baker's termination to be without "Cause."

104.    As a result of Montrone's, Meister's and Perspecta's actions, Baker has suffered and will continue to suffer harm, including physical, emotional and financial harm.

**COUNT II**
**Retaliation in Violation of 42 U.S.C. § 12101 *et. seq*. and RSA 354-A**
**(Against Montrone, Meister and Perspecta)**

105.    Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-104 above, as if set forth fully herein.

106.    On or about January 30, 2018, Baker engaged in a protected activity when he filed his Charge of Discrimination with the HRC.

107.    Thereafter, Perspecta, Montrone and Meister "changed" Baker's termination from a without "Cause" termination to be deemed a termination for "Cause."

108.    Perspecta, Montrone, and Meister changed the designation of Baker's termination to be a termination for "Cause" in retaliation for Baker's efforts to press his claims of discrimination.

109.    As a result of Montrone's, Meister's and Perspecta's actions, Baker has suffered

and will continue to suffer harm, including, but not limited to the purported forfeiture of 60,000

Profits Units in Perspecta Entities and 37,500 Profits Units in Perspecta Investments.

**COUNT III**
**Discrimination in Violation of 42 U.S.C. § 12101 _et. seq_. and RSA 354-A**
**(Against Perspecta)**

110.    Baker repeats, realleges and incorporates herein by reference the allegations

contained in Paragraphs 1-109 above, as if set forth fully herein.

111.    At all relevant times, Baker was a qualified individual with a disability (or was

regarded as an individual with a disability) and/or was associated with family members

suffering from disabilities and/or regarded as suffering from disabilities.

112.    By January 2016 at the latest, Perspecta knew Baker's family members were

suffering from physical and mental disabilities (real or perceived), and upon information and

belief knew Baker was suffering as a result of the various hardships he was enduring in his

personal life.  Perspecta also knew, as of January 2016, that Baker was taking medication and

that his previous attempts to try alternative medications were unsuccessful.  The January 2016

correspondence with Perspecta's CFO also indicates that the CFO was inappropriately informed

of the name of the medication Baker was taking, which was a known anti-depressant.  Upon

information and belief, Perspecta knew Baker was suffering from a disability (real or perceived)

and/or regarded Baker as an individual suffering from a disability (real or perceived).

113.    At all relevant times, Baker was able to perform the essential functions of his job,

with or without reasonable accommodation, and was indeed performing the essential functions

of his job with Perspecta.

114.     Baker was treated differently by Perspecta on account of his disability (real or perceived) and/or because Perspecta regarded Baker as disabled and/or on account of his association with his family members who were suffering from disabilities (real or perceived).

115.     Baker was pressured to resign from Perspecta on account of his disability (real or perceived) and/or because he was regarded as disabled and/or on account of his association with his family members who were suffering from disabilities (real or perceived).

116.     Perspecta wrongfully terminated Baker's employment on account of his disability (real or perceived) and/or because it regarded Baker as disabled and/or on account of Baker's association with his family members who were suffering from disabilities (real or perceived).

117.     As a result of Perspecta's actions, Baker has suffered and will continue to suffer harm, including physical, emotional and financial harm.

**COUNT IV**
**Hostile Work Environment in Violation of 42 U.S.C. § 12101 *et. seq*. and RSA 354-A**
**(Against Perspecta)**

118.     Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-117 above, as if set forth fully herein.

119.     Perspecta fostered a work environment that was hostile towards individuals with disabilities.  Indeed, those who did not meet the definition of robust and healthy had no place within the company.

120.     Upon information and belief, Perspecta knew Baker was suffering from a disability and/or regarded Baker as an individual suffering from a disability and knew that Baker associated with family members who were suffering from disabilities (real or perceived).

121.     Baker was subjected to an environment, fostered by Meister and Montrone, which was intimidating, hostile and abusive and included behavior such as outwardly discriminating against individuals whom Perspecta suspected suffered from physical or mental health

disabilities, subjecting prospective employees who had been offered employment to company-required physical and psychological examinations, Meister's disassociation from Baker and exclusion of Baker from aspects of the business he was tasked to oversee, Montrone's efforts to "insulate" Baker from Perspecta's clients, pressuring Baker to resign and ultimately terminating Baker's employment.

122.    Baker found the environment at Perspecta hostile, and Perspecta's environment would be considered objectively offensive to others.

123.    As a result of Perspecta's actions, Baker has suffered and will continue to suffer harm, including physical, emotional and financial harm.

## COUNT V
## Aiding and Abetting in violation of RSA 354-A
### (Montrone and Meister)

124.    Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-123 above, as if set forth fully herein.

125.    At all relevant times, Montrone and Meister fostered an environment at Perspecta that was hostile to individuals with disabilities.

126.    Montrone and Meister aided and abetted Perspecta's discriminatory treatment of Baker by directly treating Baker in a disparate manner and actively participating in the decision to terminate his employment.  Indeed, after Baker voiced his concerns regarding the discriminatory treatment he was receiving at Perspecta, Montrone and Meister decided Baker "wasn't the right guy" for Perspecta, rather than working to address Baker's concerns about Perspecta's discriminatory and hostile work environment and its potential impact on Perspecta's business.

127.     Upon information and belief, Montrone and Meister made the decision to terminate Baker's employment and urged the Perspecta Trust Board of Directors to remove Baker as President of Perspecta Trust.

128.     As a result of Montrone and Meister's actions, Baker has suffered and will continue to suffer harm, including physical, emotional and financial harm.

## COUNT VI
## Fraudulent Inducement
### (Montrone, Meister and Perspecta Holdings)

129.     Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-128 above, as if set forth fully herein.

130.     As detailed above, in or around the fourth quarter of 2015 Montrone and Meister decided to "restructure" Baker's equity interest in Perspecta Holdings in a manner, which, according to Montrone and Meister, was intended to purposefully decrease Baker's stake in Perspecta.

131.     In or around the fourth quarter of 2015, Montrone informed Baker that he had plans to restructure Baker's equity in Perspecta Holdings to give more permanence to his interests and to give Baker what Montrone termed "true equity."  Montrone told Baker that his new plan would be more similar to that which was used by Ballentine Partners.  Baker understood that he would be granted capital interests (Class A membership interests) instead of the profits interests (Class B membership interests) that he presently held.  Montrone did not tell Baker that a plan was in place to decrease his ownership interest in the company by awarding him different interests in two smaller entities instead of in Perspecta Holdings.  Nor did he tell Baker that he wanted to terminate Baker's employment with the company.  Nor did Montrone express any dissatisfaction in Baker's performance, or that of the company overall, especially

4842-4592-1938.4

given the company's significant financial improvement or award nominations and receipt. Rather, Montrone repeatedly conveyed to Baker that he was a valued owner of the company and that his 2012 Equity Award would be replaced with a new plan that would be "much better" for Baker. Montrone indicated that Baker would welcome the changes and convinced Baker that the new plan would be a significant upgrade.

132.    In January 2016, when Montrone met with Baker to discuss the unilateral termination of the 2012 Equity Award and the corresponding buy-out price, which Baker asserted was unreasonably low, Montrone assured Baker that as a result of the "much better" replacement plan, Baker would not be harmed by the low valuation, as his "re-entry" price under the new, better plan would be based on the same, low valuation.

133.    As business partners, co-members in a closely-held LLC, and as Montrone was the managing member of the closely-held LLC, Baker took Montrone at his word and trusted him. Accordingly, based on Montrone's representations, Baker signed the Redemption Agreement without representation from counsel and without having the opportunity to see the terms of his proposed "much better" equity award, effective January 1, 2016, which redeemed his Profits Units in Perspecta Holdings at an unreasonably low price.

134.    At the time Montrone represented to Baker that his 2012 Equity Award would be replaced by a "much better" equity plan and that Baker would not be harmed by the low valuation, Montrone knew that such statements were false and misleading.

135.    Montrone made the misrepresentations to Baker with the intent and expectation that Baker would rely on them and in order to convince Baker to redeem his equity stake in Perspecta Holdings.

136.     Meister, with knowledge that Perspecta Holdings intended to redeem Baker's equity and replace his 2012 Equity Award with a plan intended to decrease his overall ownership interest in the company and significantly increase Montrone's and Meister's discretionary authority regarding such plan, failed to tell Baker of these material facts and signed the Redemption Agreement.

137.     Later in 2016, Montrone presented Baker with his new equity plan; however, rather than presenting Baker with the "much better" plan, as promised, he presented Baker with worse equity plans providing him profits interests (not capital interests) in two subsidiary companies of Perspecta Holdings, and not at the holding company level. The new equity awards also had far less valuable monetary and non-monetary terms for Baker.

138.     Baker reasonably relied upon Montrone's misrepresentations and Meister's omissions in entering into the Redemption Agreement, permitting Perspecta Holdings to redeem his 20% equity interest and permitting Perspecta Holdings to redeem his interests at an unreasonably low value.  Baker's reliance on Montrone's representations and Meister's omissions was reasonable, given the fiduciary nature of their relationship and the fact that Baker reported to Montrone, and given Perspecta's continued and mounting financial success under Baker's leadership.

139.     Perspecta Holdings redeemed Baker's 20% equity interest at an unreasonably low value.  Baker was not otherwise required to redeem his vested equity in Perspecta Holdings.

140.     As result of Montrone's, Meister's, and Perspecta Holdings' actions, Baker was wrongfully and inequitably deprived of his 20% equity stake in Perspecta Holdings. Accordingly, Baker seeks a declaration that he is entitled to reinstatement of his 20% equity

stake in Perspecta Holdings, effective January 1, 2016 and such other and further relief as this Court deems just and proper.

## COUNT VII
## Breach of Fiduciary Duty
### (Montrone and Meister)

141.    Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-140 above, as if set forth fully herein.

142.    At all relevant times, Montrone, Meister and Baker were members of Perspecta Holdings and its related entities, which were closely-held entities.  Montrone and Meister were managers of Perspecta Holdings.

143.    In this position of trust and confidence, Montrone and Meister owed Baker a duty of loyalty and a fiduciary duty of utmost good faith and loyalty.

144.    Beginning in late 2015, Montrone and Meister embarked on an effort to freeze Baker out of the business that he effectively built.

145.    By late 2015, Perspecta was becoming a force within the trust industry.  Through Baker's leadership, Perspecta began receiving awards and recognition and rapidly growing its client base.

146.    As Perspecta's success mounted and Montrone and Meister were faced with the prospect of sharing the growing proceeds of its success with Baker, Montrone and Meister, unbeknownst to Baker, decided to take active steps to reduce Baker's ownership interest in the company, to benefit themselves and harm Baker, including redeeming Baker's vested equity stake in Perspecta Holdings by making as little payout as possible regardless of what payout would have been fair, and to ultimately freeze Baker out of the business entirely and avoid a large payout to Baker upon his anticipated, but undisclosed termination.

4842-4592-1938.4

147.     In early 2016, Montrone and Meister first worked to "restructure" Baker's equity stake in the company by making material misrepresentations and omissions to Baker concerning the future of his equity position within the company and the redemption of his then-existing equity interest in Perspecta Holdings.  Upon information and belief, Montrone and Meister made these misrepresentations and omissions knowing that they would ultimately terminate Baker's employment, to try to avoid the need to make a further payout to Baker upon his termination and to generally freeze him out of the companies.

148.     Based on Montrone's promise that a "much better" plan was forthcoming and that he would not be harmed by the low valuation attributed to Perspecta Holdings for purposes of redeeming his equity interests, Baker signed the Redemption Agreement in or around May 2016, effective January 1, 2016.

149.     Much later in 2016, rather than presenting Baker with the "much better" plan he was promised, Montrone presented Baker with the 2016 Equity Awards and Equity Plans, which granted Baker a substantially reduced equity stake in the company, substantially limited Baker's rights, and, worst of all, replaced his fully-vested equity in Perspecta Holdings, with unvested Profits Units in two smaller, less valuable subsidiaries.

150.     Once Baker's equity was reduced, Montrone told Baker that his future with Perspecta was in jeopardy.  Montrone, Meister and Perspecta then made continuous efforts up to and including December 8, 2017 to force Baker to resign.  Upon information and belief, Montrone and Meister wanted Baker to resign, as, under the terms of the 2016 Equity Plans, if Baker resigned he would automatically forfeit all of his unvested Profits Units in Perspecta Entities and Perspecta Investments and the companies would have the right to redeem his vested

Profits Units, whereas if Perspecta terminated Baker without Cause, all of his unvested Profits Units would automatically vest – a result Montrone and Meister wanted to avoid.

151.    When Baker refused to resign, Montrone and Meister terminated his employment and caused the Board of Directors to remove his as President.  Such termination occurred days before another 20,000 of his Profits Units in Perspecta Entities and another 12,500 of his Profits Unites in Perspecta Investments were set to vest.  More than fifteen months later, after the filing of this lawsuit, Defendants declared that Baker's termination was for "Cause" and declared that his unvested Profits Units as of December 8, 2017 had been forfeited.

152.    Montrone's and Meister's actions and efforts to freeze Baker out of the company violated their fiduciary duties to Baker and caused substantial harm to Baker including, but not limited to, the loss of his vested equity in Perspecta Holdings, Perspecta Entities and Perspecta Investments.  Accordingly, Baker seeks a declaration that he is entitled to reinstatement of his 20% equity stake in Perspecta Holdings, effective January 1, 2016, reinstatement of his 7.1% interest in Perspecta Entities, his 4.55% interest in Perspecta Investments and such other and further relief as this Court deems just and proper.

**COUNT VIII**
**Unjust Enrichment**
**(Perspecta Holdings, Perspecta Entities and Perspecta Investments)**

153.    Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-152 above, as if set forth fully herein.

154.    In or around May 2016, effective January 1, 2016, Perspecta Holdings redeemed Baker's 20% equity interest in Perspecta Holdings for an unreasonably low value.

155.    At the time Perspecta Holdings redeemed Baker's interests, it knew that it was paying a substantially reduced amount to Baker, given the value of his equity.

156. By accepting Baker's 20% equity interest for less than a fair value, Perspecta Holdings has been unjustly enriched in an amount to be determined at trial.

157. Allowing Perspecta Holdings to retain Baker's 20% equity interest without payment of fair value would be inequitable.

158. After Baker initiated this action in January 2018, Perspecta Entities and Perspecta Investments "changed" Baker's termination from one considered to be "without Cause" to one considered to be a termination for "Cause" under the 2016 Equity Plans. Accordingly, Perspecta Entities and Perspecta Investments caused Baker to forfeit all unvested Profits Units Baker held under the 2016 Equity Awards and 2016 Equity Plans as of December 8, 2017.

159. By wrongfully causing Baker to forfeit his unvested Profits Units in Perspecta Entities and Perspecta Investments, Perspecta Entities and Perspecta Investments have been unjustly enriched in an amount to be determined at trial.

160. Allowing Perspecta Entities and Perspecta Investments to retain Baker's wrongfully forfeited Profits Units would be inequitable.

161. Accordingly, Baker seeks a declaration that he is entitled to reinstatement of his 20% equity stake in Perspecta Holdings, effective January 1, 2016, reinstatement of his full 7.1% interest in Perspecta Entities, effective December 8, 2017, reinstatement of his full 4.55% interest in Perspecta Investments, effective December 8, 2017, and such other and further relief as this Court deems just and proper.

### COUNT IX
### Breach of Contract
### (Perspecta Entities and Perspecta Investments)

162. Baker repeats, realleges and incorporates herein by reference the allegations contained in Paragraphs 1-161 above, as if set forth fully herein.

163.    The 2016 Equity Awards are valid, binding and enforceable contracts between Baker and Perspecta Entities and Perspecta Investments, respectively.

164.    The 2016 Equity Awards granted Profits Units to Baker, subject to the terms and conditions set forth in the 2016 Equity Plans.

165.    Baker performed all of his obligations to Perspecta Entities and Perspecta Investments under the terms of the 2016 Equity Awards and 2016 Equity Plans.

166.    Sections 5.5(b)(i) of the 2016 Equity Plans provide, in relevant part, that if Baker is terminated from Perspecta without "Cause," as that term is defined in the 2016 Equity Plans, then any Unvested Profits Units Baker held as of the date of his termination would automatically vest.

167.    On December 8, 2017, Perspecta terminated Baker's employment without "Cause."

168.    After the commencement of this action, Perspecta "changed" the classification of Baker's termination to be deemed a termination for "Cause."

169.    Perspecta Entities and Perspecta Investments have deemed Baker's unvested Profits Units as of December 8, 2017 to be "forfeited."

170.    Upon information and belief, neither Perspecta Entities nor Perspecta Investments properly accelerated the vesting of Baker's Profits Units, as required by the 2016 Equity Plans when he was terminated without "Cause" on December 8, 2017, or, if they had, they "reversed" the acceleration because of the *post hoc* "Cause" determination and caused Baker to improperly forfeit all Profits Units other than those which had vested prior to December 8, 2017.

171.    By failing to properly accelerate the vesting of Baker's Profits Units, Perspecta Entities and Perspecta Investments breached their contractual obligations to Baker under the terms set forth in the 2016 Equity Plans.

172.    Alternatively, by "reversing" any proper acceleration because of a *post hoc* determination that Baker's termination should be considered a "for Cause" termination, Perspecta Entities and Perspecta Investments breached their contractual obligations to Baker.

173.    Perspecta Entities and Perspecta Investments breaches of their contractual obligations to Baker have caused substantial harm, including the purported loss of 75% of Baker's equity stake in those entities and any profits that would have been due and owing to Baker as a result of his equity stake in those entities.

174.    Accordingly, Baker seeks a declaration that he is entitled to reinstatement of his full 7.1% interest in Perspecta Entities, effective December 8, 2017, reinstatement of his full 4.55% interest in Perspecta Investments, effective December 8, 2017, and such other and further relief as this Court deems just and proper., in an amount to be determined at trial.

**Plaintiff Scott Baker demands a jury trial on all counts so triable.**

WHEREFORE, Plaintiff Scott Baker respectfully seeks an order:

A.  Entering judgment in favor of Baker on Count I of his Complaint;

B.  Entering judgment in favor of Baker on Count II of his Complaint;

C.  Entering judgment in favor of Baker on Count III of his Complaint;

D.  Enter judgment in favor of Baker on Count IV of his Complaint;

E.  Enter judgment in favor of Baker on Count V of his Complaint;

F.  Enter judgment in favor of Baker on Count VI of his Complaint;

G.  Enter judgment in favor of Baker on Count VII of his Complaint;

4842-4592-1938.4

H.  Enter judgment in favor of Baker on Count VIII of his Complaint;

I.  Enter judgment in favor of Baker on Count IX of his Complaint;

J.  Awarding Baker reinstatement of his position as President of Perspecta Trust effective December 8, 2017 with no break in service and with the same rights and benefits as if he had never been terminated;

K.  Awarding Baker reinstatement of his 20% equity interest in Perspecta Holdings

L.  Declaring that Baker's equity interests in Perspecta Entities and Perspecta Investments fully vested as of December 8, 2017 and reinstating Baker's fully vested equity interests in those companies as of December 8, 2017;

M.  Awarding Baker monetary damages, including but not limited to, lost wages (past and future), emotional distress damages and other compensatory damages as this Court deems just and proper;

N.  Awarding Baker enhanced compensatory and punitive damages as allowable;

O.  Awarding Baker his costs, expenses, attorneys' fees and interest; and,

P.  Awarding such other and further relief as this Court deems just and proper.

4842-4592-1938.4

Respectfully submitted,

SCOTT BAKER,
By his attorneys,

*/s/Jennifer L. Mikels*
Teri L. Pastori (#12136)
Beth A. Deragon (#16347)
PASTORI | KRANS, PLLC
70 Commercial Street, Suite 203
Concord, NH 03301
(603) 369-4769
tpastori@pastorikrans.com
bderagon@pastorikrans.com

Jennifer B. Furey (BBO # 634174)
Admitted *pro hac vice*
Jennifer L. Mikels (BBO # 682199)
Admitted *pro hac vice*
GOULSTON & STORRS PC
400 Atlantic Avenue
Boston, Massachusetts 02110-3333
Telephone (617) 482-1776
Facsimile (617) 574-4112
jfurey@goulstonstorrs.com
Dated: June 17, 2019          jmikels@goulstonstorrs.com

4842-4592-1938.4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the above date.

*/s/Jennifer L. Mikels*
Jennifer L. Mikels

4842-4592-1938.4